**LAW OFFICES OF**
# GARY G. BECKER, P.L.L.C
**40 FULTON STREET • 17th FLOOR**
**NEW YORK, NEW YORK 10038-5077**

TELEPHONE
(212) 785-7565

FACSIMILE: (212) 214-0901
becker@garybeckerlaw.com

March 14, 2022

Honorable Richard J. Sullivan
United States Circuit Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

>  *Re: United States v. Angel Suarez, 11 Cr. 839 (RJS)*

Dear Judge Sullivan:

When Angel Suarez appeared before this Court for sentencing in May 2012, he had just turned nineteen. His prior criminal history was limited to a few misdemeanor offenses, all since expunged by operation of law, for simple possession of small amounts of marijuana. He had no history of violence, and none was alleged in connection with the offense that brought him before the Court. But the offense of conviction, possession of a shotgun in furtherance of possession of crack cocaine with intent to sell, mandated a ten-year prison term and that was the sentence this Court imposed. A prison term greater than 50% of the total time teen-aged Angel Suarez had then spent on Earth must have seemed like forever to him.

The prison years went by agonizingly slowly but in September 2020, Mr. Suarez was finally released. Although not well-equipped to integrate into a society ravaged by COVID-19, Mr. Suarez initially showed promise and determination. He quickly found employment, then found another, higher-paying job, became involved with a woman he cared about, reported to Probation as required, and stayed out of trouble. But after about six or seven months, in the Spring of 2021, after Mr. Suarez's girlfriend threw him out for being unfaithful to her, Mr. Suarez began to go off the rails. Beset by anxiety and frustration, Mr. Suarez self-medicated with marijuana (and cocaine at least once), started showing up for work late and was fired, began to shirk his responsibilities, and engaged in the conduct underlying the VOSR Specifications, and resulted in his remand to the MDC on November 1, 2021.

Your Honor will sentence Mr. Suarez for his violations of supervised release on March 30, 2022, at 10 a.m. The applicable policy statement sentencing range for Specification 1, the most serious violation, is 8 to 14 months. By the time he is sentenced, Mr. Suarez will have spent two days shy of five months in custody at the MDC, under conditions that several courts in this district have noted are extraordinarily harsh. Given that factor and the others discussed herein, we respectfully submit that a sentence of time served, accompanied by other conditions including drug treatment, is sufficient to address Mr. Suarez's breach of the Court's trust. Five months at the MDC in near solitary confinement is sufficiently onerous to have sent Mr. Suarez the very strong message that serious violations of supervised release have severe consequences, but not so long as to undermine his successful reintegration into society. Indeed, although the Probation Department recommended the imposition of an 8-month term of imprisonment in its Violation Report, we are advised that upon further consideration the Probation Department will recommend a sentence of time served in its forthcoming submission to the Court, as will the Government.

**Mr. Suarez's Violations of Supervised Release Should be Sanctioned Primarily as Breaches of the Court's Trust Rather than as Punishment for the Unlawful Conduct that Gave Rise to the Violation Specifications**

In considering its approach to sanctioning violations of supervised release, the Sentencing Commission debated two different options. The first option treated a defendant's failure to comply with a condition of supervised release as a "breach of trust" with the Court. As the Commission explained:

> While the nature of the conduct leading to the revocation would be considered in measuring the extent of the breach of trust, imposition of an appropriate punishment for any new criminal conduct would not be the primary goal of a revocation sentence. Instead, the sentence imposed…would be intended to sanction the violator for failing to abide by the conditions of the court-ordered supervision, leaving the punishment for any new criminal conduct to the court responsible for imposing the sentence for that offense.

U.S.S.G. Ch. 7 Pt. A. (3)(b). The second option considered by the Commission would punish violators "for the particular conduct triggering the revocation as if that conduct were being sentenced as new federal criminal conduct." *Id*. After considered debate, the Commission adopted the theory consistent with the first option: "*i.e.*, at revocation, the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator." *Id*. This makes good

sense for various reasons, including that a defendant alleged to have violated a condition of his supervised release is not accorded the full panoply of constitutional and statutory protections attendant to criminal prosecutions.

Accordingly, when considering the appropriate sentence here, we urge the Court's primary focus to be on the nature of Mr. Suarez's breach of trust, informed by Mr. Suarez's compliance with the conditions of his release both before and after the violations, rather than on punishment for the specific conduct that triggered the violations.

### Mr. Suarez's Violations Were Book-Ended by A Record of Positive Adjustment and Attitude

There have been three chapters in Mr. Suarez's story since his term of supervised release commenced on September 18, 2020. As noted in the Violation Report, the first chapter began with Mr. Suarez hitting the ground running (in a good way) when his term began. Within eleven days he had begun a respectable job at F&F Hardware and Supply, Inc., in the Bronx, at $15 an hour. See Violation Report, at 2. Mr. Suarez remained gainfully employed there for almost six months until, in March 2021, Mr. Suarez secured a higher-paying job at Just Bagels, also in the Bronx. Throughout this period, he was living with his then-girlfriend, Jeanette Diaz, and maintaining compliance with the conditions of his release. *Id.*

But in April 2021, Ms. Diaz ended their relationship and Mr. Suarez, though certainly at fault for being unfaithful, took it hard. As detailed in the Violation Report, during the next several months, Mr. Suarez's "compliance seemed to shift as he struggled to maintain a stable residence and employment." *Id.* He tested positive for marijuana use on several occasions, for cocaine use once, and then missed three required drug-testing appointments. After the police questioned him about a motor vehicle accident, Mr. Suarez failed to notify Probation within the required 72-hours. His descent into the darkness of his teenage years reached the bottom on August 30, 2021, when Mr. Suarez was arrested by NYPD in possession of a backpack containing approximately four grams of crack cocaine packaged in scores of small containers, and a single glassine envelope that laboratory testing identified as containing a tiny amount of fentanyl.[1]

Following Mr. Suarez's arrest and positive drug tests, in early September 2021, the Probation Department referred him to outpatient substance abuse treatment. Perhaps it was the shock to his system of his recent arrest, but in its aftermath, Mr. Suarez seems to have

---

[1] As Mr. Suarez admitted in his admission to Specification 2, he believed this envelope contained heroin. He had no idea that the substance may have been fentanyl or was "cut" with fentanyl. Neither the Probation Department nor the Government allege otherwise.

turned the page to the third chapter of this story, a chapter marked by his resolve to get his life back on the straight and narrow.  On September 10, 2021, Mr. Suarez completed the first part of the intake and assessment protocols at Samaritan Village Daytop-Bronx. *Id*. at 3. Following the parties' initial appearance on September 29, 2021, on the Violation Report, Mr. Suarez took several positive, concrete actions, all confirmed by Probation. Mr. Suarez:

(1) Attended drug treatment classes at Good Samaritan Daytop each week for three weeks following the court appearance on September 29, 2021 (and only missed subsequent dates because of his hospitalization and treatment after being the victim of gunshot). *See* Government Letter to the Court, dated October 28, 2021, at 3.

(2) Reported to Probation as directed for an employment assessment on October 6, 2021. *Id*.

(3) Submitted an application to the United Parcel Service for employment in its warehouse in Newburgh, NY, and was hired at a starting salary of $18.50 an hour beginning November 2, 2021 (the Court remanded Mr. Suarez November 1, 2021). (Confirmation of job offer is attached as an exhibit).

(4) Reported to Probation as directed on October 20, 2021, for drug testing.

(5) Received notice from the State University of New York Brooklyn Educational Opportunity Center, dated November 1, 2021, congratulating Mr. Suarez for his acceptance into their OSHA Program.  Successful completion of this program could lead to valuable employment opportunities for Mr. Suarez in the construction industry.

Consistent with these positive steps, Mr. Suarez also made it clear to me, and then to the Government, the Probation Department, and the Court, that he was willing to accept responsibility for all the charged violations, including the violations arising from the Bronx drug charges. Significantly, Mr. Suarez did not waver in that commitment even after I informed him that the Bronx criminal charges had been dismissed because the search of Mr. Suarez's knapsack was found to be violative of the Fourth Amendment.

### Treating Mr. Suarez's Dependency on Drugs is Vital to His Successful Reintegration into Society

The Court's remand of Mr. Suarez on November 1, 2022, necessarily interrupted temporarily the outpatient drug treatment he had begun and his starting work at UPS. The "primary purpose of supervised release is to facilitate the integration of offenders back into

the community rather than punish them."[2] As the Court observed at the last appearance on February 28, 2022, Mr. Suarez has ample support from his family to regain his footing. If he is released, Mr. Suarez intends to resume living with his girlfriend in the Bronx, whose name and address have been provided to the Probation Department. He will, of course, seek work immediately. But the most critical ingredient to his success is treatment for his long dependency on drugs.

As noted, Mr. Suarez was one month past his nineteenth birthday when he came before the Court for sentencing in 2012. His mother was all of 16 when she gave birth to him. His childhood was disadvantaged in myriad ways. As confirmed in the Presentence Report, young Angel was diagnosed with speech and learning disabilities and placed in special education classes at an early age. He stopped attending school in the tenth grade, began hanging out on the streets, and turned, like countless others, to smoking marijuana and using other drugs to alleviate boredom and stress and help him feel a little better about himself. *See* PSR, dated March 23, 2012, at ¶¶30-42.

At sentencing, the Court was presented with ample evidence that Mr. Suarez had a long history of using illegal drugs, including marijuana. The Presentence Report emphasized this and noted that Mr. Suarez had never received drug counseling. The Probation Department assessed Mr. Suarez as posing "a high risk for future substance abuse" and, therefore, recommended a "special condition requiring substance abuse counseling." *See* PSR Sentencing Recommendation.

This likely informed the Court's recommendation to the Bureau of Prisons that Mr. Suarez "be placed in a facility that has the 500-hour program to enable defendant to address substance abuse issues." *See* Judgment, filed May 3, 2012, at 2 [Doc. 21]. That Mr. Suarez might still be at risk of using illegal drugs when he was released from prison nearly a decade later, was not overlooked. Hence, the Court ordered that the conditions of Mr. Suarez's supervision following his release from prison include drug testing and treatment. *Id*.

Unfortunately, the Bureau of Prisons deemed Mr. Suarez ineligible for entry into the 500-hour drug program due to his conviction under 18 U.S.C. §924(c). Notwithstanding the Court's recommendation, Mr. Suarez was denied access to the comprehensive education and toolset that he needed desperately to help him get off drugs. He endured the hardship of imprisonment for almost nine years, in facilities where access to marijuana and other contraband was not uncommon. It is not surprising that after years of smoking

---

[2] *See* U.S. Sentencing Commission, *Primer, Supervised Release,* at n.20 (2021), https://www.ussc.gov/sites/default/files/pdf/training/primers/2021_Primer_Supervised_Release.pdf.

marijuana both in and out of prison, Mr. Suarez came out of prison as dependent on marijuana as when he went in.

Mr. Suarez had begun outpatient drug treatment in the weeks before November 1, 2021, when he was remanded.  He is eager to rejoin society and resume that treatment.

### The Court Should take into Consideration the Harshness of Mr. Suarez's Confinement at the MDC

For almost the entirety of Mr. Suarez's confinement at the MDC these past five months, he and his fellow prisoners have been locked down in their cells for approximately 23 and ½ hours per day.  These lockdowns were implemented with understandable intentions – to stanch the transmission of COVID-19 but the consequences to the inmates have been devastating.  On January 31, 2022, the Bureau of Prisons imposed a second nationwide lockdown that lasted for weeks following a deadly melee involving gang members at USP Beaumont (Texas). Until very recently, all visits from family members were canceled. Legal visits have been greatly curtailed. The limited educational classes that once were offered, have all been suspended. In addition to the extraordinary mental stresses induced by this extreme isolation, because inmates are given precious little time outside their cells each day they must choose among showering, trying to phone home, exercising, or accessing the computer to check email.

Many courts in this district have decried the inhumane conditions of confinement in New York's MCC and MDC since the onset of COVID-19.   Most prominently, at a sentencing hearing in April 2021, Judge McMahon declared that the facilities were run by "morons" and that the conditions there were "inhuman."[3] Her Honor further observed that the facilities' ineptitude and failure to "do anything meaningful" amounted to the "single thing in the five years that I was the chief judge of this court that made me the craziest." Finally, the Judge said: "It is the finding of this court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *Id*.

Several other judges in this district have explicitly varied downward from the applicable sentencing guidelines for defendants held at the MCC or MDC during the pandemic, often citing the statutory provision relating to just punishment, 18 U.S.C. §3553(a)(2)(D).  For example, Judge Oetken found that for sentencing purposes, time spent at the MCC during COVID-19 should count as 1.5 or 2 times the actual time in custody.

---

[3] *See* Shayna Jacobs, *"Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions,"* Washington Post, May 7, 2021 (available online at https://www.washingtonpost.com/natonal-security/jails-run-by-morons-judge-says/2021/05/07/3b8b00c4-af46-11ed-acd3-2b44a57093a_story.html).

*United States v. Gonzalez*, 18-cr-669 (JPO)(Doc. 250)("[m]ost of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors most of that time…" And I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served…That's what I believe in terms of how punitive it's been and how harsh it's been.").

In *United States v. Lizardi*, 11-cr-1032 (S.D.N.Y. Oct. 9, 2020) [Doc. 2523], Judge Engelmayer found that in considering the harshness of pre-trial confinement in the section 3553(a) analysis:

> A day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing.

*Id.* Judge Engelmayer was echoing concerns expressed by Judge Rakoff, who noted that incarceration during the pandemic is "harsher and more punitive than would otherwise [be] the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus…have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020).

Other judges in this district have factored the harsh conditions at the MDC and MCC into the sentencing calculus, and we trust that the Court is familiar with the concerns these jurists have expressed; accordingly, unless the Court thinks it useful, we will not burden the Court with the string cites or further discussion here.

**Conclusion**

Mr. Suarez deeply regrets engaging in the conduct that brings him back before the Court. His conduct was inexcusable, and he knows it. He has spent the past five months locked up in near solitary confinement thinking every minute about this. But Mr. Suarez has also demonstrated that he has the potential to lead a productive, law-abiding life.  Just before his remand on November 1, 2021, he had secured a job at UPS for $18,50 an hour, had been approved for enrollment in an OSHA course, and was attending drug treatment. For approximately six months following his release from prison in September 2020, he worked full time and stayed out of trouble. Mr. Suarez is eager to prove to the Court, the Probation Department, and his family that he can again be a good citizen. With the guidance of the Probation Department and drug treatment, we believe he can do it. For all these

reasons, we respectfully ask the Court to give Mr. Suarez another chance and sentence him to time-served with appropriate conditions of release.

                                  Respectfully submitted,

                                  Gary G. Becker

Enclosures

cc: Matthew King, AUSA (by ECF)
    Daveena Tumasar, USPO (by email)